Barry I. Levy, Esq.
Michael Vanunu, Esq.
Joanna Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and                    Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                                        Plaintiffs,

                                                                        **Plaintiff Demands a Trial by Jury**

            -against-

CAREPOINT MEDICAL SUPPLY INC., BORIS
FLEYSHMAN, A & G LIFE CARE INC., ALINA
BERKMAN, HEALTH AND SAFETY INC., VERA
FIRAYNER, MEDCOMFORT SUPPLY INC., ANNA
SHANDITSEVA, ROSA LYNN SUPPLY INC.,
ROCIO CRUZ DE ROBLES, VITALLINK MEDICAL
SUPPLY INC., TATYANA KRUZHKOVA, and JOHN
DOE DEFENDANTS "1" through "10",

                                        Defendants.
-------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

## INTRODUCTION

1.      GEICO brings this action to recover more than $2,000,000.00 that Defendants have wrongfully obtained from GEICO by submitting and causing to be submitted thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") comprised of, among other things, medically unnecessary custom fit lumbar sacral orthoses ("LSOs"), custom fit shoulder orthoses, cold compression therapy units a/k/a cold compression therapy systems ("CCTUs"), and infrared heating pad systems (collectively, the "Fraudulent Equipment"). The charges for the Fraudulent Equipment were submitted or caused to be submitted through a series of companies known as Medcomfort Supply Inc. ("Medcomfort Supply"), A & G Life Care Inc. ("A&G Life Care"), Health and Safety Inc. ("Health and Safety"), Rosa Lynn Supply Inc. ("Rosa Lynn Supply"), Carepoint Medical Supply Inc. ("Carepoint Med Supply"), and Vitallink Medical Supply Inc. ("Vitallink Med Supply") (collectively, the "DME Providers"). The Fraudulent Equipment is alleged have been provided to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

2.      The DME Providers are all New York companies that are purportedly owned by Boris Fleyshman ("Fleyshman"), Alina Berkman ("Berkman"), Vera Firayner ("Firayner"), Anna Shanditseva ("Shanditseva"), Rocio Cruz de Robles ("Cruz de Robles"), and Tatyana Kruzhkova ("Kruzhkova") (collectively, the "Paper Owner Defendants"), who in conjunction with others not presently identifiable to GEICO, devised a scheme to obtain medically unnecessary and duplicated/photocopied prescriptions from healthcare providers working out of no-fault clinics in the New York metropolitan area (the "Referring Providers") through unlawful kickbacks and other financial incentives. Once the prescriptions were secured, Defendants then billed GEICO

collectively more than $3,596,000.00, with each DME Provider making virtually identical fraudulent misrepresentations to GEICO concerning the types of Fraudulent Equipment allegedly provided to Insureds. As part of their scheme to extract money from GEICO without detection, Defendants shifted the billing submitted to GEICO from one DME Provider to the next over the course of greater than one year and continue to do so through the present day.

3.    GEICO seeks to terminate this fraudulent scheme and recover more than $2,000,000.00 that has been wrongfully obtained by the DME Providers, the Paper Owner Defendants, and John Doe Defendants "1" – "10" (the "John Doe Defendants") (collectively, the "Defendants") since 2024 and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,359,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the DME Providers since 2024 because:

(i)    Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed as a result of unlawful financial arrangements with others who are not presently identifiable;

(ii)   Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was purportedly prescribed and provided pursuant to predetermined fraudulent protocols designed to exploit Insureds for financial gain, without regard for genuine patient care;

(iii)  Defendants billed GEICO for DME/OD that often was provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions; and

(iv)   To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds in order to fraudulently inflate the reimbursement rate for the Fraudulent Equipment, as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds.

4.    The Defendants fall into the following categories:

(i)    The DME Providers are New York companies that purport to purchase

3

DME from wholesalers, purport to provide the Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for Fraudulent Equipment;

(ii)     Defendant Fleyshman is listed on paper as the owner, operator, and controller of Carepoint Med Supply, when, as discussed below, Fleyshman works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from all the DME Providers, and used Carepoint Med Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii)    Defendant Berkman is listed on paper as the owner, operator, and controller of A & G Life Care, when, as discussed below, Berkman works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used A & G Life Care to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iv)     Defendant Firayner is listed on paper as the owner, operator, and controller of Health and Safety, when, as discussed below, Firayner works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used Health and Safety to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(v)      Defendant Shanditseva is listed on paper as the owner, operator, and controller of Medcomfort Supply, when, as discussed below, Shanditseva works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used Medcomfort Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(vi)     Defendant Cruz de Robles is listed on paper as the owner, operator, and controller of Rosa Lynn Supply, when, as discussed below, Cruz de Robles works for one of the John Doe Defendants who secretly operated, managed controlled and financially benefited from all the DME Providers, and used Rosa Lynn Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(vii)    Defendant Kruzhkova is listed on paper as the owner, operator, and controller of Vitallink Med Supply, when, as discussed below, Kruzhkova works for one of the John Doe Defendants who secretly operated, managed

4

controlled and financially benefited from all the DME Providers, and used Vitallink Med Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(viii)    The John Doe Defendants are citizens of New York and are presently not identifiable but are: (i) secretly controlling and profiting from the DME Providers; (ii) associated with the Referring Providers and various multi-disciplinary medical offices that purportedly treat high-volume of No-Fault insurance patients (the "Clinics"); (iii) are the sources of prescriptions to the DME Providers; and/or (iv) conspired with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

5.    As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)    The Fraudulent Equipment provided – to the extent that any Fraudulent Equipment was provided – was medically unnecessary and based upon phony prescriptions, including, at times, ones that were duplicated/photocopied, obtained as a result of unlawful financial arrangements between Defendants and others who are not presently identifiable and, thus, not entitled for no-fault insurance reimbursement in the first instance;

(ii)    The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent provided – pursuant to predetermined fraudulent protocols created by Defendants and others not presently identifiable to GEICO to enrich themselves, rather than to treat the Insured based on individual medical needs;

(iii)    The DME/OD dispensed by the Defendants were often provided – to the extent provided – as a result of decisions made by laypersons, not based upon prescriptions issued by licensed healthcare providers; and

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds in order to fraudulently inflate the reimbursement rate for the Fraudulent Equipment, as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds.

6.    As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

7.     The charts attached hereto as Exhibits "1" through "6", set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Defendants' fraudulent scheme through Carepoint Med Supply, A & G Life Care, Health and Safety, Medcomfort Supply, Rosa Lynn Supply, and Vitallink Med Supply.

8.     The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has been ongoing for many years and began no later than March 2024.  The fraudulent scheme has continued uninterrupted since that time.

9.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $2,000,000.00.

## THE PARTIES

### I.     Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are each Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.     Defendants

11.     John Doe Defendant "1" (hereinafter, the "Secret Owner") is a citizen of New York and is presently not identifiable but is secretly controlling and profiting from the DME Providers, and conspired with others, who are not presently identifiable, at various Clinics to obtain prescriptions purportedly issued by the Referring Providers that were used by the DME Providers to submit bills to GEICO, and other New York automobile insurers, seeking payment for the Fraudulent Equipment.

6

12.    Defendant Fleyshman is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Carepoint Med Supply.

13.    Defendant Carepoint Med Supply is a New York corporation with its principal place of business in Brooklyn, New York. Carepoint Med Supply was incorporated on November 1, 2024 and is owned on paper and purportedly operated and controlled by Fleyshman. In actuality, the Secret Owner operated, managed, controlled and financially benefited from Carepoint Med Supply and, with the aid of Fleyshman, used Carepoint Med Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.    Defendant Berkman is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of A & G Life Care.

15.    Defendant A & G Life Care is a New York corporation with its principal place of business in Brooklyn, New York. A & G Life Care was incorporated on May 29, 2024 and is owned on paper and purportedly operated and controlled by Berkman. In actuality, the Secret Owner operated, managed controlled and financially benefited from A & G Life Care and, with the aid of Berkman, used A & G Life Care as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16.    Defendant Firayner is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Health and Safety.

17.    Defendant Health and Safety is a New York corporation with its principal place of business in Brooklyn, New York. Health and Safety was incorporated on August 2, 2024 and is owned on paper and purportedly operated and controlled by Firayner. In actuality, Secret Owner operated, managed controlled and financially benefited from Health and Safety and, with the aid of Firayner, used Health and Safety as a vehicle to submit fraudulent billing to GEICO and other

New York automobile insurers.

18.    Defendant Shanditseva is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Medcomfort Supply.

19.    Defendant Medcomfort Supply is a New York corporation with its principal place of business in Brooklyn, New York. Medcomfort Supply was incorporated on March 25, 2024 and is owned on paper and purportedly operated and controlled by Shanditseva. In actuality, Secret Owner operated, managed controlled and financially benefited from Medcomfort Supply and, with the aid of Shanditseva, used Medcomfort Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

20.    Defendant Cruz de Robles is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Rosa Lynn Supply.

21.    Defendant Rosa Lynn Supply is a New York corporation with its principal place of business in Queens, New York. Rosa Lynn Supply was incorporated on September 23, 2024 and is owned on paper and purportedly operated and controlled by Rahman. In actuality, Secret Owner operated, managed controlled and financially benefited from Rosa Lynn Supply and, with the aid of Cruz de Robles, used Rosa Lynn Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

22.    Defendant Kruzhkova is domiciled in, resides in, and is a citizen of New York and is listed as the paper owner of Vitallink Med Supply.

23.    Defendant Vitallink Med Supply is a New York corporation with its principal place of business in Brooklyn, New York. Vitallink Med Supply was incorporated on December 9, 2024 and is owned on paper and purportedly operated and controlled by Kruzhkova. In actuality, Secret Owner operated, managed controlled and financially benefited from Vitallink Med Supply and,

with the aid of Kruzhkova, used Vitallink Med Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

25.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

26.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

27.     GEICO underwrites automobile insurance in the State of New York.

I.     **An Overview of the Pertinent Laws**

A.     **Pertinent Laws Governing No-Fault Insurance Reimbursement**

28.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

29.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to

provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

30.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

31.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

32.    Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

33.    For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

34.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019) the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient".

35.    Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a

business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

36.     Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection, formerly Department of Consumer Affairs ("DCWP"), in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

37.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

38.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

39.     Prohibited kickbacks include more than the payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

40.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as

"Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

41.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

42.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

43.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

44.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault Benefits.

45.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators, electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

46.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs. These devices come in direct contact with the outside of the body, and include items such as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and the like.

47.     Effective on April 4, 2022, the New York State Workers' Compensation Board instituted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("Fee Schedule"), which is reflected in 12 N.Y.C.R.R. 442.2.

48.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the Fee Schedule.

49.     According to the Fee Schedule, certain pieces of DME and OD have an established fee payable ("Fee Schedule item"), which is the maximum permissible charge for that specific item of DME and OD based on its Healthcare Common Procedure Coding System ("HCPCS") Code, which provides specific characteristics and requirements that an item of DME and OD must meet in order to qualify for reimbursement under that specific HCPCS Code.

50.     For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning

13

HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

51.    Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted, and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding- Definitions Used for Off-the Sheft versus Custom Fitted Prefabricated Orthotics (Braces)- Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

52.    The DME Fee Schedule also includes the maximum weekly rental charge for certain Fee Schedule Items.

53.    Where a specific piece of DME does not have a maximum reimbursement rate in the DME Fee Schedule ("Non-Fee Schedule item"), then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

54.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

55.    Effective June 1, 2023, the New York State Department of Financial Services

issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault

reimbursement for rental charges of DME that does not have a reimbursement rate in the Fee

Schedule or is not specifically identified within the Fee Schedule.

56.     Accordingly, when a healthcare provider submits a bill to collect charges from an

insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among

other things – that:

| | | |
|---|---|---|
| (i) | The provider is in compliance with all significant statutory and regulatory requirements; |
| (ii) | The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions; |
| (iii) | The prescription for DME or OD is not based on any unlawful financial arrangement; |
| (iv) | The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription; |
| (v) | The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and |
| (vi) | The fee sought for DME provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item. |

II.     **Defendants' Fraudulent Scheme**

A.     **The DME Providers' Common Secret Ownership**

57.     The John Doe Defendants conspired with the Paper Owner Defendants to

implement a complex fraudulent scheme in which the DME Providers were used consecutively

and in conjunction with each other over the course of over one year to bill GEICO and other New

York automobile insurers for millions of dollars in No-Fault Benefits to which they were never

entitled to receive.

15

58.     While each of the DME Providers were formed and listed as being independently owned by one of the Paper Owner Defendants, all of the DME Providers were actually controlled by the Secret Owner, who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

59.     The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents that needed to be filed with the State of New York and City of New York to lawfully operate the DME Providers.

60.     In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Providers that could only exist through the Secret Owner's involvement.

61.     For example, the DME Providers were all incorporated by one of two LLCs, which merged in 2024, located in Hewlett, New York. The use of a single company to incorporate each of the DME Providers, which purport to be six separate and independent entities, would not be possible without the Secret Owner and Defendants' active participation in a common scheme.

62.     Additionally, as part of the common scheme involving the Secret Owner, the DME Providers each received medically unnecessary prescriptions for Fraudulent Equipment that were issued according to predetermined treatment protocols.

63.     As discussed further below, these prescriptions were not given to the Insureds for purposes of selecting their own provider, but routed directly to the DME Providers, who then purported to bill GEICO and other New York insurers for specific types of Fraudulent Equipment in an effort to (i) remove the Insured from the decision making process, and (ii) limit the amounts

of billing submitted by any one DME Provider and mask the common scheme.

64.     In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there the DME Providers that billed for the same type of Fraudulent Equipment operated in sequential order in an effort to limit the amount of billing submitted from any one of the DME Providers and mask the common fraudulent scheme.

65.     To that end, the DME Providers operated in the following sequential manner:

(i)      Medcomfort billed GEICO between March 26, 2024 and June 21, 2024;

(ii)     A and G Life Care billed GEICO June 15, 2024 and August 10, 2024;

(iii)    Health and Safety billed GEICO between August 16, 2024 and September 24, 2024;

(iv)     Rosa Lynn Supply billed GEICO between September 24, 2024 and December 9, 2024;

(v)      Carepoint Med Supply billed GEICO between November 15, 2024 and January 19, 2025; and

(vi)     Vitallink Med Supply billed GEICO beginning January 15, 2025 through the present.

66.     Similarly, and as part of the common scheme, based on the unlawful financial arrangements between the Secret Owner, the Paper Owner Defendants, and others who presently not identifiable but affiliated with the Clinics, the DME Providers each received prescriptions for Fraudulent Equipment from multiple Referring Providers in the New York metropolitan area. For example:

(i)      All of the DME Providers received prescriptions for Fraudulent Equipment from Wei Hong Xu NP ("NP Xu") and Aleksandr Kopach, PA ("PA Kopach");

(ii)     Carepoint, A&G Life Care, Health and Safety, Medcomfort Supply, and Rosa Lynn Supply received prescriptions from Elizabeth LaFargue NP ("NP LaFargue") and Junie White NP ("NP White");

      (iii)    Carepoint, A & G Life Care, Health and Safety, Rosa Lynn Supply, and Vitallink Med Supply received prescriptions from Jamie Arnau PA ("PA Arnau") and Joyce Malks PA ("PA Malks"); and

      (iv)    Carepoint, A & G Life Care, Health and Safety, Medcomfort Supply, and Vitallink Med Supply received prescriptions from Stella Amanze PA ("PA Amanze").

67.    In addition, and as part of the common scheme, based on the unlawful financial arrangements between the Secret Owner, the Paper Owner Defendants, and others who presently identifiable but who are affiliated with the Clinics, the DME Providers each received prescriptions for Fraudulent Equipment from Clinics in the New York metropolitan area. For example:

      (i)    All of the DME Providers received prescriptions for Fraudulent Equipment from No-Fault Clinics located at 107-48 Guy Brewer Boulevard, Jamaica, New York (the "Guy Brewer Boulevard Clinic"), 5205 Church Avenue, Brooklyn, New York (the "Church Avenue Clinic"), 84-08 Queens Boulevard, Elmhurst, New York (the "Queens Boulevard Clinic"), and 2723 Atlantic Avenue, Brooklyn, New York (the "2723 Atlantic Avenue Clinic");

      (ii)    Carepoint Med Supply, A & G Life Care, Health and Safety, Rosa Lynn Supply, and Vitallink each received prescriptions from a No-Fault Clinic located at 137-42 Guy R Brewer Boulevard, Jamaica, New York (the "Guy R Brewer Boulevard Clinic"); and

      (iii)    Carepoint, A & G Life Care, Health and Safety, Medcomfort Supply, and Vitallink Med Supply each received prescriptions from a No-Fault Clinic located at 89-25 130th Street, Richmond Hill, New York (the "130th Street Clinic").

68.    Additionally, the DME Providers dispensed and predominantly billed for many of the same Fee Schedule and Non-Fee Schedule items. For example, among other things, all of the DME Providers purportedly dispensed and billed for "infrared heating pad systems" under HCPCS E0221, custom fit shoulder orthoses under HCPCS L3671, positioning cushions under HCPCS T5001, custom fit LSOs under HCPCS L0632, and CCTUs under E1399.

69.    What is more, all of the DME Providers retained the Law Offices of John Gallagher PLLC and/or Samandarov & Associates PC to represent them in connection with the submission

of billing to GEICO, and prosecution of subsequent collections proceedings.

70.    In further keeping with the fact that the Defendants operated as part of an integrated scheme, the DME Providers dispensed Fraudulent Equipment to the same Insureds over the course of the Insureds' treatments.

71.    Further, as part of Defendants' efforts to mask the Secret Owner's operation and control of the DME Providers, GEICO attempted to verify the claims submitted by Defendants by way of examinations under oath, but the Paper Owner Defendants intentionally refused to appear and provide testimony and/or documents because they would have been unable to answer key questions about the DME Providers' operations and their testimony would reveal the secret ownership scheme.

**B.    Overview of the Common Fraudulent Scheme**

72.    The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Providers as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits, which Defendants were never entitled to receive.

73.    To maximize the amount of no-fault benefits Defendants could receive, the Secret Owner along with the Paper Owner Defendants, used the DME Providers in sequential fashion to divide the billing that they were submitting to no-fault insurance carriers, including GEICO.

74.    Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the DME Providers to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.  Specifically:

> (i)    Between March 2024 and June 2024, Medcomfort Supply submitted more than $560,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $250,000.00, and there is more than $262,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants

continue to seek payment of from GEICO;

(ii)    Between June 2024 to August 2024, A & G Life Care submitted more than $580,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $404,000.00, and there is more than $176,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(iii)    Between August 2024 and September 2024, Health and Safety submitted more than $620,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $470,000.00, and there is more than $145,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(iv)    Between September 2024 and December 2024, Rosa Lynn Supply submitted more than $624,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $470,000.00, and there is more than $140,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(v)    Between November 2024 and January 2025, Carepoint Med Supply submitted more than $623,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $358,000.00, and there is more than $238,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO; and

(vi)    Between January 2025 and the present, Vitallink Med Supply submitted more than $600,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $269,000.00, and there is more than $330,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO.

75.    Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of improper agreements with John Doe Defendants "2" through "10" associated with the Clinics who are not presently identifiable.

76.    As part of this scheme, Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by various Referring Providers who treated Insureds at the various Clinics.

77.    None of Defendants marketed or advertised the DME Providers to the general

public, they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

78.     Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

79.     Instead, Defendants entered illegal, collusive agreements with the Clinics, John Doe Defendants, and Referring Providers and steered them to prescribe and direct large volumes of the same prescriptions (or purported prescriptions) to the DME Providers for the specifically targeted Fraudulent Equipment.

80.     Defendants received the prescriptions for Fraudulent Equipment, purportedly issued by the Referring Providers as part of the unlawful financial arrangements with the John Doe Defendants, directly from the Clinics and without going through the Insureds. At times these prescriptions were bogus and contained a duplicated signature of the Referring Provider who purportedly issued the prescription.

81.     The prescriptions obtained by the DME Defendants for Fraudulent Equipment included prescriptions for both Fee Schedule and Non-Fee Schedule items which the DME Defendants used to (i) misrepresent the nature and quality of the items intended by the prescriptions; (ii) misrepresent the nature and quality of the items that they actually dispensed to claim entitlement to a higher fee payable by automobile insurers like GEICO; and (iii) misrepresent the maximum reimbursement rate they were entitled to receive for Non-Fee Schedule items.

82.     As part of the scheme, the Clinic Controllers directed that the prescriptions issued by the Referring Providers should often be written in a generic, vague, non-descript manner so that the DME Defendants could have the flexibility to dispense the products that would result in the highest forms of reimbursement from GEICO.

83.     The DME Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of DME and/or OD that could be provided to the Insureds.  As a result, in virtually every circumstance available, the DME Defendants purported to provide the Insureds with a variation that had high – if not one of the highest – maximum reimbursement rates under the applicable fee schedule.

84.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Defendants indicated that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

85.     However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment often did not match the HCPCS Codes identified in the bills submitted by the DME Defendants.

86.     Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, the DME Defendants often provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes identified in the bills submitted by the DME Defendants.

87.     The Fraudulent Equipment actually provided to Insureds – again to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that

only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by the DME Defendants.

88.     The DME Defendants, by purchasing inexpensive and poor-quality Fraudulent Equipment, which they used to fill the generic and vague prescriptions provided by the Clinic Controllers and Referring Providers, executed a scheme to bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

### C.     The Defendants' Unlawful Financial Arrangements

89.     To obtain access to Insureds as part of their fraudulent scheme and to maximize the No-Fault Benefits Defendants could obtain from GEICO and other New York automobile insurers, Defendants entered into unlawful financial agreements with the John Doe Defendants who are not presently identifiable but who are associated with the Clinics where prescriptions for Fraudulent Equipment were provided to Defendants in exchange for financial consideration.

90.     Since the inception of Defendants' fraudulent scheme, Defendants engaged in unlawful financial arrangements with the John Doe Defendants to obtain prescriptions for Fraudulent Equipment. These schemes allowed Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

91.     As part of the unlawful financial arrangements, Defendants would pay others who are not presently identifiable, including fictitious businesses, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers at the Clinics.

92.     The Defendants were able to enter unlawful financial arrangement schemes with the John Doe Defendants in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

93.     These Clinics provide facilities for the Referring Providers, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's no-fault insurance system.

94.     In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at certain of the Clinics that were the sources of the prescriptions for Defendants, which start and stop operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

95.     For example, one of the Clinics from which Defendants obtained prescriptions was the 130th Street Clinic. GEICO has received billing from a "revolving door" of approximately forty-five (45) purportedly different healthcare providers at the 130th Street Clinic.

96.     Pursuant to the unlawful financial arrangements, Defendants paid thousands of dollars in kickbacks to the John Doe Defendants or to fictitious businesses that existed for no legitimate purpose at the direction of the John Doe Defendants.

97.     Defendants were willing to pay thousands of dollars in kickbacks because the John Doe Defendants were able to direct prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers to Defendants, which Defendants used as a basis to support their fraudulent bills to GEICO.

24

98.    In keeping with the fact that the prescriptions for the Fraudulent Equipment were the result of unlawful financial arrangements, Medcomfort Supply and A & G Life Care issued payments to Top Notch Wholesale Inc. ("Top Notch Wholesale") for no legitimate purpose.

99.    Top Notch Wholesale is not a legitimate wholesaler. Rather, Top Notch Wholesale, and its owner Arthur Gitlevich ("Gitlevich"), are drivers of fraudulent no-fault insurance schemes and have been sued multiple times for their involvement in such schemes, in which it has been alleged that they laundered funds to hide the existence of illegal financial arrangements between participants in No-Fault fraud schemes, including individuals who owned and/or managed No-Fault clinics. See Gov't Emps. Ins. Co. et al. v. Grody et al., 1:24-cv-04125(RER)(PK) (E.D.N.Y. 2024) Gov't Emps. Ins. Co. et al. v. Poonawala et al., 1:22-cv-03063(PKC)(VMS) (E.D.N.Y. 2022), Gov't Emps Ins. Co. et al. v. Grody et al., 1:22-cv-06187(RER)(PK) (E.D.N.Y. 2022), Gov't Emps Ins. Co. et al. v. Ahmad et al., 1:22-cv-06713(RER)(PK) (E.D.N.Y. 2022).

100.    To that end, when deposed in connection with a separate no-fault insurance fraud action, Gitlevich invoked his Fifth Amendment privilege against self-incrimination when asked whether Top Notch Wholesale was formed for the sole purpose of laundering money as a part of numerous No-Fault fraud schemes.

101.    Gitlevich was able to funnel payments received to cash because virtually all the money received by Top Notch Wholesale was issued to ADG International, which is another entity owned by Gitlevich, and then cashed at a check-cashing facility in Pennsylvania.

102.    Further, Gitlevich testified on behalf of himself and Top Notch Wholesale in connection with the Gov't Emps. Ins. Co. v. Poonawala case in April of 2024 during which he confirmed the address used by Top Notch Wholesale is Gitelvich's home address and then asserted his 5th Amendment privilege against self-incrimination to virtually all questions, including

questions regarding if Top Notch Wholesale performed any legitimate business services and if Top Notch Wholesale was formed solely to launder money as part of numerous no-fault insurance schemes.

103.    In addition, Gitlevich was also named as a defendant in Gov't Emps. Ins. Co. v. Grody, et al., 1:24-cv-04125-FB-MMH, alleging he funneled money through Top Notch Wholesale in the same manner as another entity he owned.

104.    In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, and as explained in detail below, the prescriptions were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

105.    In keeping with the fact that Defendants obtained prescriptions for Fraudulent Equipment that were not medically unnecessary and were provided pursuant to predetermined fraudulent protocols, Defendants: (i) received prescriptions for predetermined items of Fraudulent Equipment from Referring Providers operating out of various Clinics; and (ii) upon information and belief, obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

106.    Furthermore, upon information and belief and to the extent that the Insureds received any Fraudulent Equipment, the Insureds at times were provided with Fraudulent Equipment directly from the Clinics, typically from the receptionists, without any involvement from Defendants.

107.    In keeping with the fact that Defendants obtained prescriptions for Fraudulent Equipment that were never actually issued by the Referring Provider, as described in more detail below, the DME Providers submitted bills to GEICO based upon prescriptions for Fraudulent Equipment that, at times: (i) were undated; and/or (ii) were issued on a date that the Insured was

not treated by the Referring Provider who purportedly issued the prescription.

108.    In all of the claims identified in Exhibits "1" through "6", Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

**D.    The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

109.    In addition to the unlawful financial arrangements between Defendants and the John Doe Defendants the prescriptions that were provided to Defendants were the result of predetermined fraudulent protocols between and among Defendants, the John Doe Defendants and the Referring Providers.

110.    The predetermined fraudulent protocols were implemented solely to maximize the billing that Defendants could submit to insurers, including GEICO, rather than to treat the Insureds based on individual medical needs.

111.    In the claims identified in Exhibits "1" through "6", virtually all the Insureds were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

112.    In keeping with the fact that many of the Insureds identified in Exhibits "1" through "6" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

113.    To the extent that the Insureds in the claims identified in Exhibits "1" through "6" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor

soft tissue injury such as a sprain or strain.

114.    Despite virtually all of the Insureds being involved in relatively minor and low impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds identified in Exhibits "1" through "6" were subject to similar treatment, including prescriptions for one or more items of Fraudulent Equipment that was dispensed by the DME Providers.

115.    The Referring Providers issued prescriptions for Fraudulent Equipment to the Insureds identified in Exhibits "1" through "6" pursuant to predetermined fraudulent protocols without regard for the Insureds individual presentation.

116.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

117.    In general, Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

(i)     an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)    the Insured would be seen by a Referring Provider;

(iii)   on the date of the first or a subsequent visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME;

(iv)    subsequently, to the extent the Insured returned to the Clinic for one or more additional evaluations and treatment, they were, at times, provided with at least one additional prescription for a predetermined set of DME, and

(v)     at least one, if not more than one, prescription for DME would be directly provided to Defendants to fill and occurred without any involvement by the Insured.

118.   Virtually all of the claims identified in Exhibits "1" through "6" are based upon medically unnecessary prescriptions for predetermined items of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

119.   Based on the boilerplate treatment plans, with predetermined Fraudulent Equipment, Defendants billed voluminous, excessive amounts of medically unnecessary DME, as part of their collusive arrangements.   At times, Defendants' billing for the predetermined Fraudulent Equipment through one or more of the DME Providers ate into a substantial part of the Insured's $50,000.00 limit of No-fault Benefits, jeopardizing the ability of these Insureds to obtain truly needed healthcare services as a result of their automobile accidents.

120.   For example:

(i)     On June 11, 2024, Insured HS was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by A&G Life Care and Health and Safety  beginning on June 21, 2024 and September 4, 2024, respectively, resulting in charges totaling $14,421.65 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insureds for any legitimate, medically necessary healthcare services.

(ii)    On June 12, 2024, Insured KH was involved in a motor vehicle accident reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by A&G Life Care and Health and Safety beginning on June 22, 2024 and August 17, 2024, respectively, resulting in charges totaling $13,955.57 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insureds for any legitimate, medically necessary healthcare services.

(iii)   On June 11, 2024, Insured AL was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by A&G Life Care and Health and Safety  beginning on June 22, 2024 and August 22, 2024, respectively, resulting in charges totaling $13,349.49 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insureds for any legitimate, medically necessary healthcare services.

(iv)    On June 11, 2024, Insured ME was involved in a motor vehicle accident

and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by A&G Life Care and Health and Safety beginning on June 21, 2024 and September 6, 2024, respectively, resulting in charges totaling <u>$13,261.19</u> for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insureds for any legitimate, medically necessary healthcare services.

(v)     On June 21, 2024, Insured CC was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by A&G Life Care and Health and Safety beginning on July 6, 2024 and August 17, 2024, respectively, resulting in charges totaling <u>$12,885.80</u> for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insureds for any legitimate, medically necessary healthcare services.

(vi)    On July 7, 2024, Insured ECR was involved in a motor vehicle accident reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by A&G Life Care and Health and Safety beginning on July 23, 2024, and August 27, 2024, respectively, resulting in charges totaling <u>$12,548.19</u> for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insureds for any legitimate, medically necessary healthcare services.

(vii)   On June 12, 2024, Insured BP was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by A&G Life Care and Health and Safety beginning on June 22, 2024 and August 20, 2024, respectively, resulting in charges totaling <u>$11,967.96</u> for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insureds for any legitimate, medically necessary healthcare services.

(viii)  On June 10, 2024, Insured TJ was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by A&G Life Care and Health and Safety beginning on July 22, 2024 resulting in charges totaling <u>$10,335.50</u> for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insureds for any legitimate, medically necessary healthcare services.

121.    These are only representative examples.

122.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the treating provider evaluates the patient's subjective complaints, and the treating provider will direct a specific course of treatment based upon the

patient's individual symptoms or presentation.

123.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but does not always – prescribe DME that should aid in the treatment of the patient's symptoms.  The specific DME that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

124.    In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME.  In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

125.    If a healthcare provider determines that DME is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed and why.

126.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

127.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

128.    An individual's age, height, weight, general physical condition, location within the

vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

129.    Insureds routinely receiving identical Fraudulent Equipment would, by extension, mean Insureds routinely complained of the exact same symptoms.

130.    It is extremely improbable – to the point of impossibility – that a substantial number of Insureds who were involved in the same accident and were purportedly issued Fraudulent Equipment from the DME Providers, would require numerous identical items of DME.

131.    In keeping with the fact that the DME dispensed by the DME Providers were not medically necessary and were prescribed and dispensed pursuant to predetermined protocols to maximize profits, the DME Providers routinely received prescriptions for substantially identical – if not exactly identical – DME issued to Insureds involved in the same accident.

132.    For example:

(i)    On May 28, 2024, two Insureds – OC and BP – were involved in the same automobile accident. Thereafter, OC and BP both presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a CCTU, Triad Device, and Positioning Seat, billed to GEICO under HCPCS E1399, E0221, and T5001, respectively, pursuant to virtually identical prescriptions. OC and BP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by A&G Life Care.

(ii)    On September 29, 2024, two Insureds – DN and SN – were involved in the same automobile accident. Thereafter, DN and BP both presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a CCTU, Triad Device, and Transcutaneous Electrical Joint Stimulation Device ("TEJSD"), billed to GEICO under HCPCS E1399, E0221, and E0762, respectively, pursuant to virtually identical prescriptions. DN and SN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident,

their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Rosa Lynn Supply.

(iii)  On August 12, 2024, two Insureds – ADV and JA – were involved in the same automobile accident. Thereafter, ADV and JA both presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a CCTU, Triad Device, and Positioning Seat, billed to GEICO under HCPCS E1399, E0221, and T5001, respectively, pursuant to virtually identical prescriptions. ADV and JA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Rosa Lynn Supply.

(iv)  On October 22, 2024, two Insureds- AA and HA - were involved in the same automobile accident. Thereafter, AA and HA both presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a CCTU and a Triad Device, billed to GEICO under HCPCS E1399 and E0221, respectively. AA and HA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Carepoint Med Supply.

(v)  On October 8, 2024, two insureds- CG and KG - were involved in the same automobile accident. Thereafter CG and KG both presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a CCTU, Triad Device, and TEJSD, billed to GEICO under HCPCS E1399, E0221, and E0762, respectively, pursuant to virtually identical prescriptions. CG and KG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Carepoint.

(vi)  On June 6, 2024, two insureds- RA and JA - were involved in the same automobile accident. Thereafter RA and JA both presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a CCTU, Triad Device, and TEJSD, billed to GEICO under HCPCS E1399,

E0221, E0762, respectively, pursuant to virtually identical prescriptions. RA and JA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Carepoint.

(vii)    On June 29, 2024 two insureds- CS and JS - were involved in the same automobile accident. Thereafter CS and JS both presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a "Bed Board", "Cervical Collar", "Cervical Pillow", "Egg Crate Mattress", "Lumbar Cushion", "Massager", and "L/S Support" billed to GEICO under HCPCS E0274, L0180, E0190, E0272, E2611, L0650, and E1399, respectively, pursuant to virtually identical prescriptions. CS and JS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Carepoint.

(viii)    On April 7, 2024, two Insureds – FM and MS – were involved in the same automobile accident. Thereafter, FM and MS both presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a "Cervical Pillow", "Cervical Collar", "Bed Board", "Cold/Hot Pack", "Egg Crate Mattress", "Lumbar Support 10" Back Panel", "Lumbar Cushion", "Thermophore", "TENS/EMS Unit", "TENS/EMS Belt", "Infrared Heating Lamp", "Massager", and "Whirlpool", billed to GEICO under HCPCS E0190, L0180, E0199, A9273, E0272, L0642, E0190, E0215, E0745, E0205, E1399 and E1300, respectively, pursuant to virtually identical prescriptions. FM and MS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Medcomfort Supply.

(ix)    On November 13, 2024, three Insureds – TW, WW, and DW – were involved in the same automobile accident. Thereafter, TW, WW, and DW all presented to the same multidisciplinary clinic for treatment. Shortly after purported examinations at the multidisciplinary clinic, they were each purportedly prescribed a CCTU, Triad Device, and TEJSD, billed to GEICO under HCPCS E1399, E0221, E0762, respectively, pursuant to virtually identical prescriptions. TW, WW, and DW were different ages, in different physical condition, and experienced the impact from different

locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Vitallink Med Supply.

133.    In further keeping with the fact that the prescriptions for Fraudulent Equipment used by Defendants to support the charges identified in Exhibits "1" through "6" were for medically unnecessary Fraudulent Equipment, and obtained as part of a predetermined fraudulent protocol, at times, the prescriptions filled by the DME Providers were purportedly issued on dates that the Insureds were never treated by the Referring Providers.

134.    For example:

(i)    Insured AR was allegedly involved in a motor vehicle accident on April 10, 2024. On June 26, 2024, A&G Life Care purportedly provided AR with an "LSO Sag Rigid Fram Cust" pursuant to a prescription purportedly issued by Nicholas Fennelli, M.D. ("Dr. Fennelli") on June 19, 2024. There is no evidence Dr. Fennelli examined or otherwise treated AR on June 10, 2024.

(ii)    Insured KS was allegedly involved in a motor vehicle accident on June 3, 2024. On July 5, 2024, A&G Life Care purportedly provided KS with a "Shoulder Orthosis, Right" pursuant to a prescription purportedly issued by NP Xu on June 28, 2024. There is no evidence NP Xu examined or otherwise treated KS on June 28, 2024.

(iii)    Insured MB was allegedly involved in a motor vehicle accident on July 17, 2024. On August 28, 2024, Health and Safety purportedly provided MB with a "EMS Unit", "TENS/EMS Replacement Belt", and "Whirlpool Portable", pursuant to prescriptions purportedly issued by Igor Zilberman, NP ("NP Zilberman") on August 23, 2024. There is no evidence NP Zilberman examined or otherwise treated MB on August 23, 2024.

(iv)    Insured FM was allegedly involved in a motor vehicle accident on June 18, 2024. On August 17, 2024, Health and Safety purportedly provided FM with an "LSO Sag Rigid Frame Cust" and "Fracture Frame Attchmnts [sic] Cervical Traction" pursuant to prescriptions purportedly issued by Muhammad Zakaria, M.D. ("Dr. Zakaria") on July 29, 2024 There is no evidence Dr. Zakaria examined or otherwise treated FM on July 29, 2024.

(v)    Insured WF was allegedly involved in a motor vehicle accident on March 6, 2024. On May 1, 2024, Medcomfort Supply purportedly provided WF with a "Lumbar Sacral Orthosis" pursuant to a prescription purportedly issued by PA Kopach on April 22, 2024. There is no evidence PA Kopach

examined or otherwise treated WF on April 22, 2024.

(vi)     Insured AS was allegedly involved in a motor vehicle accident on April 5, 2024. On April 17, 2024, Medcomfort Supply purportedly provided AS with an "Infrared Heating Lamp", "Massager", "Heating Pad", "EMS Unit", and "Whirlpool" pursuant to prescriptions purportedly issued by NP LaFargue on April 8, 2024. There is no evidence NP LaFargue examined or otherwise treated AS on April 8, 2024.

(vii)    Insured WS was allegedly involved in a motor vehicle accident on August 2, 2024. On October 1, 2024, Rosa Lynn Supply purportedly provided WS with a "Cold Therapy Machine" and Triad Device pursuant to prescriptions purportedly issued by Barbara Baptiste, NP ("NP Baptiste") on September 26, 2024. There is no evidence NP Baptiste examined or otherwise treated WS on September 26, 2024.

(viii)   Insured DA was allegedly involved in a motor vehicle accident on August 14, 2024. On September 25, 2024, Rosa Lynn Supply purportedly provided DA with a "Cold Therapy Machine" pursuant to a prescription purportedly issued by Dr. Zakaria on September 18, 2024. There is no evidence Dr. Zakaria examined or otherwise treated DA on September 18, 2024.

(ix)     Insured YS was allegedly involved in a motor vehicle accident on December 29, 2024. On January 17, 2025, Vitallink Med Supply purportedly provided YS with a "Cold Therapy Machine with Brace" pursuant to a prescription purportedly issued by Irina Zavulunova, NP ("NP Zavulunova") on January 2, 2025. There is no evidence NP Zavulunova examined or otherwise treated YS on January 2, 2025.

(x)      Insured ED was allegedly involved in a motor vehicle accident on September 20, 2024. On January 18, 2025, Vitallink Med Supply purportedly provided ED with an "LSO Sag Rigid Frame Cust" and "Cervical Traction Equipment" pursuant to a prescription purportedly issued by Dr. Brown on November 26, 2024. There is no evidence Dr. Brown examined or otherwise treated ED on November 26, 2024.

135.    These are only representative examples.

136.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were obtained as part of a predetermined fraudulent protocol, there were often significant delays between the date on which the prescription was issued and the date on which it was delivered to the Insured. For example:

(i)     Insured RW was allegedly involved in a motor vehicle accident on September 19, 2024. Thereafter, RW sought treatment with Dr. Hadley at 787 Meacham Avenue, Elmont NY (the "Meacham Avenue Clinic"). On November 4, 2024, Dr. Hadley purportedly issued a prescription to RW for a Triad Device, which was delivered to RW by Vitallink Med Supply over two months later on January 18, 2025.

(ii)    Insured JA was allegedly involved in a motor vehicle accident on September 27, 2024. Thereafter, JA sought treatment with Dr. Hadley at the Meacham Avenue Clinic. On November 4, 2024, Dr. Hadley purportedly issued a prescription to JA for a Triad Device, which was delivered to JA by Vitallink Med Supply over two months later on January 18, 2025.

(iii)   Insured JH was allegedly involved in a motor vehicle accident on April 12, 2024. Thereafter, JH sought treatment with Jordan Fersel, M.D. ("Dr. Fersel") at 2354 Westchester Avenue, Bronx, NY (the "Westchester Avenue Clinic"). On July 15, 2024, Dr. Fersel purportedly issued prescriptions to JH for a Triad Device and TEJSD which were delivered to JH by Health and Safety over a month later, on August 21, 2024.

(iv)    Insured RA was allegedly involved in a motor vehicle accident on January 23, 2024. Thereafter, RA sought treatment with Amanda Hussein, DC ("Dr. Hussein") at 448 Suffolk Avenue, Brentwood, NY (the "Suffolk Avenue Clinic"). On March 12, 2024, Dr. Hussein purportedly issued prescriptions to RA for a CCTU and attendant accessories which were delivered to RA by Medcomfort Supply over a month later, on April 30, 2024.

(v)     Insured JIP was allegedly involved in a motor vehicle accident on November 28, 2024. Thereafter, JIP sought treatment with Shai Bikel, NP ("NP Bikel) at 1760 Grand Avenue 1st Floor, Bronx, NY (the "Grand Avenue Clinic"). On December 2, 2024, NP Bikel purportedly issued a prescription to JIP for a CCTU which was delivered to JIP by Vitallink Med Supply over one month later on January 18, 2025.

(vi)    Insured HE was allegedly involved in a motor vehicle accident on September 18, 2024. Thereafter, HE sought treatment with NP White at 2723 Atlantic Avenue, Brooklyn, NY (the "Atlantic Avenue Clinic"). On September 27, 2024, NP White purportedly issued prescriptions to HE for a CCTU, Triad Device, Positioning Seat, which were delivered to HE by Rosa Lynn Supply nearly one month later, on October 17, 2024.

(vii)   Insured SG was allegedly involved in a motor vehicle accident on June 18, 2024. Thereafter, SG sought treatment with Artur Kaykov, NP ("NP Kaykov") at 381 Sunrise Highway, Lynbrook, NY (the "Sunrise Highway Clinic"). On June 27, 2024, NP Kaykov purportedly issued prescriptions to SG for a "Lumbar Orthosis", "Lumbar Sacral Support", "Egg Crate Mattress", "Bed Board", "Heating Pad (Thermophore)", "Cold and Hot

Pack", "Cervical Collar", and "Cervical Traction w/ Pump", which were delivered to SG by A&G Life Care nearly one month later, on July 20, 2024.

(viii)    Insured CV was allegedly in a motor vehicle accident on July 14, 2024. Thereafter, CV sought treatment with Dr. Vaynshteyn at the Church Avenue Clinic. On August 29, 2024, Dr. Vaynshteyn purportedly issued a prescription to CV for a "Lumbar Orthosis Brace (with MRI)", which was delivered to CV by Health and Safety nearly one month later on September 24, 2024.

(ix)    Insured SM was allegedly involved in a motor vehicle accident on July 25, 2024. Thereafter, SM sought treatment with PA Amanze at 1100 Pelham Parkway, Bronx, NY (the "Pelham Parkway Clinic"). On August 14, 2024, PA Amanze purportedly issued a prescription to SM for a CCTU which was delivered to SM by Health and Safety nearly one month later on September 4, 2024.

(x)    Insured HS was allegedly involved in a motor vehicle accident on August 10, 2024. Thereafter, HS sought treatment with Dr. Fersel at the Westchester Avenue Clinic. On October 21, 2024, Dr. Fersel purportedly issued a prescription to HS for a Triad Device, which was delivered to HS by Carepoint Med Supply nearly one month later on November 16, 2024.

137.    These are only representative examples.

138.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "6" were part of predetermined protocols designed to maximize profits, and not based upon medical necessity, Defendants took affirmative steps to conceal the amount of DME being dispensed to individual Insureds through the DME Providers.

139.    Specifically, at the behest of the John Doe Defendants, the Referring Providers would often issue multiple prescriptions for DME on the same date. The DME Providers would then submit a separate bill to GEICO for each separate prescription.

140.    Alternatively, the Referring Providers issued a single prescription prescribing multiple items of DME to a single insured which were dispensed and delivered on the same day, and for which the DME Providers submitted multiple separate bills.

141.    For example:

(i)     An Insured named KM was allegedly involved in a motor vehicle accident on June 2, 2024.  On June 11, 2024, KM received a prescription for a "Cervical Pillow", "Lumbar Cusion [sic]", "Lumbar Sacral Support", "Bed Board", "Egg Crate Mattress", "Cervical Collar", left and right "Shoulder Support," and left and right "Knee Support", a separate prescription for a CCTU, a separate prescription for a Triad Device, a separate prescription for a Positioning Seat, and a separate prescription for a TEJSD, from NP Xu. A&G Life Care then submitted six separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| KM | June 21, 2024 | (i) Cervical Pillow, (ii) Cervical, Multiple Post Collar, (iii) Lumbosacral Support, (iv) Mattress, Foam Rubber, (v) Over-Bed Table, and (vi) Positioning Cushion |
| KM | June 21, 2024 | Cold Therapy Machine with Brace |
| KM | June 21, 2024 | 3LT Infrared Heating Pad |
| KM | June 21, 2024 | (i) Shoulder Orth, Acromio/Clavicular - Left, (ii) Shoulder Orth, Acromio/Clavicular - Right, (iii) KO Elas w/ Condyle Pads & JO - Right, and (iv) KO Elas w/ Condyle Pads & JO - Left |
| KM | June 21, 2024 | Position Seat Spec Orth Need |
| KM | June 21, 2024 | TEJSD |

(ii)    An Insured named GD was allegedly involved in a motor vehicle accident on June 12, 2024.  On June 14, 2024, GD received a prescription for "Cervical Pillow", "Lumbar Cusion [sic]", "Lumbar Sacral Support", "Bed Board", "Egg Crate Mattress", "Cervical Collar", left and right "Shoulder Support," and left "Knee Support", a separate prescription for a CCTU, a separate prescription for a Triad Device, a separate prescription for a Positioning Seat, and a separate prescription for a TEJSD, from NP Xu. A&G Life Care then submitted six separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| GD | June 21, 2024 | (i) Cervical Pillow, (ii) Cervical, Multiple Post Collar, (iii) Lumbosacral Support, and (iv) Positioning Cushion |
| GD | June 21, 2024 | Cold Therapy Machine with Brace |
| GD | June 21, 2024 | 3LT Infrared Heating Pad |

| GD | June 21, 2024 | (i) Shoulder Orth, Acromio/Clavicular - Left, (ii) Shoulder Orth, Acromio/Clavicular - Right, (iii) KO Elas w/ Condyle Pads & JO - Right,  (iv) Over-Bed Table, and (v) Mattress Foam Rubber |
|---|---|---|
| GD | June 21, 2024 | Position Seat Spec Orth Need |
| GD | June 21, 2024 | TEJSD |

(iii)   An Insured named CW was allegedly involved in a motor vehicle accident on July 10, 2024.  On July 16, 2024, CW received a prescription for a "Cervical Pillow", "Lumbar Cusion [sic]", "Lumbosacral Support", "Bed Board", "Egg Crate Mattress", "Cervical Collar", left and right "Shoulder Support", and left and right "Knee Support", a separate prescription for a CCTU, a separate prescription for a Triad Device, a separate prescription for a Positioning Seat, and a separate prescription for a TEJSD, from NP Xu. Health and Safety then submitted four separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---|---|---|
| CW | August 17, 2024 | (i) LSO SC R Ant/Pos PNL Pre OTS, (ii) Bed Board (iii) Egg Crate Mattress (iv) Cer Post Col Occ/Man SUP Adj, and (v) Cervical Roller |
| CW | August 17, 2024 | Cold Therapy with Universal Brace |
| CW | August 17, 2024 | Triad 3LT |
| CW | August 17, 2024 | (i) Knee Support, (ii) Knee Support (iii) Shoulder Elastic, (iv) Shoulder Elastic, and (v) Gen Use Back Cush |

(iv)   An Insured named LR was allegedly involved in a motor vehicle accident on July 14, 2024.  On July 24, 2024, LR received a prescription for a Triad Device and a separate prescription for a CCTU from PA Amanze. Health and Safety then submitted two separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---|---|---|
| LR | August 17, 2024 | Triad 3LT |
| LR | August 17, 2024 | Cold Therapy with Universal Brace |

(v)   An Insured named SL was allegedly involved in a motor vehicle accident on April 11, 2024.  On April 16, 2024, SL received a prescription for a Triad Device and a separate prescription for a CCTU and equipment from NP Xu. Medcomfort Med Supply then submitted two separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| SL | April 22, 2024 | Triad 3LT Infrared Heating Pad |
| SL | April 22, 2024 | (i) Cold Therapy Universal Wrap, and (ii) Cold Therapy Universal Equipment |

(vi)    An Insured named MA was allegedly involved in a motor vehicle accident on September 20, 2024.  On October 24, 2024, MA received a prescription for a "Infra Red Lamp", "Personal Massager", "T.E.N.S./E.M.S. Unit-4 Lead", "Whirlpool", and "EMS Placement Belt" from Julie Ellis, NP. Carepoint Med Supply then submitted two separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| MA | November 19, 2024 | Massager |
| MA | April 17, 2024 | (i) Infrared Heating Lamp, (ii) Whirlpool, and (iii) EMS Unit |

(vii)   An Insured named VMC was allegedly involved in a motor vehicle accident on August 26, 2024.  On September 18, 2024, VMC received a prescription for a CCTU, a separate prescription for a Triad Device, and a separate prescription for a Positioning Seat from NP White. Rosa Lynn Supply then submitted three separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| VMC | September 28, 2024 | Cold Therapy Machine |
| VMC | September 28, 2024 | 3LT Infrared Heating Pad |
| VMC | September 28, 2024 | Position Seat Spec Orth Need |

(viii)  An Insured named AS was allegedly involved in a motor vehicle accident on August 28, 2024.  On September 9, 2024, AS received a prescription for a CCTU, a separate prescription for a Triad Device, and a separate prescription for a Positioning Seat from NP LaFargue. Rosa Lynn Supply then submitted three separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| AS | September 24, 2024 | Cold Therapy Machine |
| AS | September 24, 2024 | 3LT Infrared Heating Pad |

| AS | September 24, 2024 | Position Seat Spec Orth Need |
|----|------|------|

(ix)   An Insured named JL was allegedly involved in a motor vehicle accident on November 11, 2024. On December 3, 2024, JL received a prescription for a CCTU, a separate prescription for a Triad Device, and a separate prescription for a TEJSD from NP Xu. Vitallink Med Supply then submitted three separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| JL | January 16, 2025 | Cold Therapy Machine with Brace |
| JL | January 16, 2025 | 3LT Infrared Heating Pad |
| JL | January 16, 2025 | TEJSD |

142.   These are only representative examples.

143.   Defendants coordinated the submission of multiple bills for Fraudulent Equipment dispensed to the same Insured on the same date in an effort to conceal the amount of DME they dispensed to individual Insureds because they knew that submitting one bill to GEICO for large amounts of DME would likely arouse suspicion and draw attention to their fraudulent scheme.

144.   In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "6" were part of predetermined protocols designed to maximize profits, and not based upon medical necessity, at times Insureds received duplicative items of DME from multiple DME companies either pursuant to the same prescription or subsequent prescriptions issued by the same Referring Provider.

145.   In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" through "6" were not medically necessary but were the result of a predetermined fraudulent protocol, the prescriptions often contained vague and generic descriptions for DME, to allow Defendants to choose the specific type of Fraudulent Equipment that they billed GEICO.

146.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that there was a contemporaneously dated evaluation report, the evaluation report often failed to explain – and at times failed to identify – the Fraudulent Equipment identified on the prescriptions provided to Defendants and used by Defendants to bill GEICO for the charges identified in Exhibits "1" through "6".

147.    To the extent the evaluation reports identified and/or referenced the DME identified on the prescriptions provided to the DME Providers, the explanations were perfunctory and non-individualized.

148.    Furthermore, to the extent the evaluation reports referenced DME prescribed to the Insureds, the DME identified was often incomplete, or otherwise differed from what was purportedly prescribed and dispensed by the DME Providers and/or other non-party DME companies.

149.    Similarly, when the Insureds continued to seek treatment with the Referring Providers, the follow-up examination reports generated by the Referring Providers often failed to discuss the Insureds' previously prescribed Fraudulent Equipment, whether the patients used the Fraudulent Equipment, or provide any indication whether the Insured should continue to use any of previously prescribed Fraudulent Equipment.

150.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "6" were issued because of predetermined fraudulent protocols and not based upon medical necessity, many of the prescriptions identified in Exhibits "1" through "6" were not actually issued by the Referring Provider listed on the prescription. Instead, in those circumstances, the prescriptions were issued by others who are not presently identifiable, without

the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions.

151.    To that end, and in support of the fact that the prescriptions for Fraudulent Equipment used by Defendants to support the charges identified in Exhibits "1" though "6" were medically unnecessary and obtained as part of a predetermined fraudulent protocol, many of the prescriptions that were purportedly issued by Referring Providers contained a photocopied or forged signature of the Referring Providers.

152.    For example:

(i)    On May 29, 2024, Quais Sayeed, M.D. ("Dr. Sayeed") purportedly prescribed Fraudulent Equipment – including an "Infrared Heating Lamp", "TENS/EMS Unit", "Whirlpool", and "Massager" – to an Insured named MR. Pursuant to Dr. Sayeed's prescription, Defendants submitted charges to GEICO through A&G Life Care totaling $1,739.82. The prescription originated from a No-Fault Clinic located at 17004 Henley Road, Jamaica, NY (the "Henley Road Clinic") and contained the following photocopied and/or stamped signature:

For a Period of 4-6 weeks, re-evaluation at that time
Additional Notes (If Necessary)



(ii)    On August 14, 2024, Dr. Sayeed purportedly prescribed Fraudulent Equipment – including an "Infrared Heating Lamp", "TENS/EMS Unit", "TENS/EMS Belt", "Whirlpool", and "Massager" – to an Insured named SM. Pursuant to Dr. Sayeed's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1,898.49. The prescription originated from the Henley Road Clinic and contained the following photocopied and/or stamped signature:

For a Period of 4-6 weeks, re-evaluation at that time
Additional Notes (If Necessary):
                    Letter of Medical Necessity



(iii)    On August 5, 2024, Dr. Sayeed purportedly prescribed Fraudulent Equipment – including a Triad Device – to an Insured named ER. Pursuant to Dr. Sayeed's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1,950.00. The prescription originated from the Henley Road Clinic and contained the following photocopied and/or stamped signature:

44

City: Jamaica    State: NY    Zip Code: 11432    Phone: 718 - 523 - 1216

NPI #: 1174043533    License #: 305028

Physician's Signature:    Date: 0805.14

(iv)   On July 18, 2024, Dr. Vaynshteyn purportedly prescribed Fraudulent Equipment – including a "Lumbar Orthosis Brace (with MRI)"– to an Insured named EMG. Pursuant to Dr. Vaynshteyn's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1,150.00. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:

PHYSICIAN:

Name: ROMAN VAYNSHTEYN, D.C.    Signature: _____

NPI: 1992078018    License: X009716-2
Address: 5205 CHURCH AVE, GROUND FLOOR,
BROOKLYN, NY, 11203
Phone: 845-201-5909   Fax: 845-201-5908

ORDER DATE: 07/18/24

(v)   On August 20, 2024, Dr. Vaynshteyn purportedly prescribed Fraudulent Equipment – including a "Lumbar Orthosis Brace (with MRI)" – to an Insured named KMA. Pursuant to Dr. Vaynshteyn's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1,150.00. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:

PHYSICIAN:

Name: ROMAN VAYNSHTEYN, D.C.    Signature: _____

NPI: 1992078018    License: X009716-2
Address: 5205 CHURCH AVE, GROUND FLOOR,
BROOKLYN, NY, 11203
Phone: 845-201-5909   Fax: 845-201-5908

ORDER DATE: 8/20/24

(vi)   On August 27, 2024, Dr. Vaynshteyn purportedly prescribed Fraudulent Equipment – including a "Lumbar Orthosis Brace (with MRI)" and "Cervical Traction Equipment (with MRI)" – to an Insured named KJT. Pursuant to Dr. Vaynshteyn's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1,722.72. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:

45

PHYSICIAN:

Name: ROMAN VAYNSHTEYN, D.C.

NPI: 1992078018    License: X009716-2

Address: 5205 CHURCH AVE, GROUND FLOOR, BROOKLYN, NY, 11203

Phone: 845-201-5909    Fax: 845-201-5908

Signature: _____

ORDER DATE: 8/27/24

(vii)    On August 15, 2024, Dr. Vaynshteyn purportedly prescribed Fraudulent Equipment – including a "Lumbar Orthosis Brace (with MRI)" – to an Insured named JT. Pursuant to Dr. Vaynshteyn's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1,150.00. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:

PHYSICIAN:

Name: ROMAN VAYNSHTEYN, D.C.

NPI: 1992078018    License: X009716-2

Address: 5205 CHURCH AVE, GROUND FLOOR, BROOKLYN, NY, 11203

Phone: 845-201-5909    Fax: 845-201-5908

Signature: _____

ORDER DATE: 8/15/24

(viii)    On July 23, 2024, Dr. Vaynshteyn purportedly prescribed Fraudulent Equipment – including a "Lumbar Orthosis Brace (with MRI)" – to an Insured named MDS. Pursuant to Dr. Vaynshteyn's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1,150.00. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:

PHYSICIAN:

Name: ROMAN VAYNSHTEYN, D.C.

NPI: 1992078018    License: X009716-2

Address: 5205 CHURCH AVE, GROUND FLOOR, BROOKLYN, NY, 11203

Phone: 845-201-5909    Fax: 845-201-5908

Signature: _____

ORDER DATE: 07/23/24

(ix)    On June 14, 2024, NP XU purportedly prescribed Fraudulent Equipment – including a Positioning Seat – to an Insured named RC. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through A&G Life Care totaling $756.03. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:

46

PHYSICIAN:

Name: WEI HONG XU, NP

NPI: 1437587417    License: 306518
Address: 5205 CHURCH AVE. GROUND FLOOR,
BROOKLYN, NY, 11203
Phone: 845-201-5909  Fax: 845-201-5908

Signature: WEI HONG XU NP
LIC:306518
NPI:1437587417
DEA:MX3137268

ORDER DATE: 6/14/24

(x)    On June 14, 2024, NP XU purportedly prescribed Fraudulent Equipment – including a Positioning Seat – to an Insured named DG. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through A&G Life Care totaling $756.03. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:



PHYSICIAN

Name  WEI HONG XU  NP

NPI 1437587417    License  306518
Address  5205 CHURCH AVE  GROUND FLOOR,
BROOKLYN  NY  11203
Phone  845 201-5909   Fax  845 201 5908

Signature  WEI HONG XU NP
LIC 306518
NPI 1437587417
DEA:MX3137268

ORDER DATE  06/14/2024

(xi)    On June 4, 2024, NP XU purportedly prescribed Fraudulent Equipment – including a Positioning Seat – to an Insured named SK. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through A&G Life Care totaling $756.03. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:



PHYSICIAN:

Name: WEI HONG XU, NP

NPI: 1437587417    License: 306518
Address: 5205 CHURCH AVE. GROUND FLOOR,
BROOKLYN, NY, 11203
Phone: 845-201-5909  Fax: 845-201-5908

Signature: WEI HONG XU NP
LIC:306518
NPI:1437587417
DEA:MX3137268

ORDER DATE: 6/4/24

(xii)    On August 17, 2024, 2024, NP XU purportedly prescribed Fraudulent Equipment – including a right "Knee Orthosis Brace (with MRI)" – to an Insured named KMA. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $536.08. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:

47

PHYSICIAN:

Name: WEI HONG XU, NP

NPI: 1437587417    License: 306518
Address: 5205 CHURCH AVE, GROUND FLOOR,
BROOKLYN, NY, 11203
Phone: 845-201-5909   Fax: 845-201-5908

Signature: WEI HONG XU NP
LIC:306518
NPI:1437587417
DEA:MX3137268

ORDER DATE: 8/17/24

(xiii)   On August 19, 2024, 2024, NP XU purportedly prescribed Fraudulent Equipment – including a left "Shoulder Orthosis Brace (with MRI)" – to an Insured named AM. Pursuant to NP Xu's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $690.23. The prescription originated from the Church Avenue Clinic and contained the following photocopied and/or stamped signature:

PHYSICIAN:

Name: WEI HONG XU, NP

NPI: 1437587417    License: 306518
Address: 5205 CHURCH AVE, GROUND FLOOR,
BROOKLYN, NY, 11203
Phone: 845-201-5909   Fax: 845-201-5908

Signature: WEI HONG XU NP
LIC:306518
NPI:1437587417
DEA:MX3137268

ORDER DATE: 8/19/24

(xiv)   On July 29, 2024, 2024, Dr. Zakaria purportedly prescribed Fraudulent Equipment – including a "Cervical Traction w/ Pump (MRI)" and "LSO APL (Custom Fitted) (MRI)" – to an Insured named FM. Pursuant to Dr. Zakaria's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1722.72. The prescription originated from 2748 Ocean Avenue 5th Floor, Brooklyn, NY (the "Ocean Avenue Clinic") and contained the following photocopied and/or stamped signature:

X _____

MUHAMMAD R. ZAKARIA, MD          LIC # 197646          NPI# 1447269824

2748 OCEAN AVE 5TH FLOOR BROOKLYN, NY 11229     TEL 718-673-8875     FAX 718-673-8878

(xv)   On July 30, 2024, Dr. Zakaria purportedly prescribed Fraudulent Equipment – including a left and right "Shoulder Support (Custom) Fitted" – to an Insured named RS. Pursuant to Dr. Zakaria's prescription, Defendants submitted charges to GEICO through Health and Safety totaling $1,380.46. The prescription originated from the Ocean Avenue Clinic and contained the following photocopied and/or stamped signature:



MUHAMMAD R. ZAKARIA, MD          LIC # 197646          NPI# 1447269824

2748 OCEAN AVE 5TH FLOOR BROOKLYN, NY 11229    TEL 718-673-8875    FAX 718-673-8878

(xvi)  On June 12, 2024, Dr. Zakaria purportedly prescribed Fraudulent Equipment – including a "Cervical Traction w/ Pump (MRI)", "LSO APL (Custom Fitted) (MRI)", and left "Knee Orthosis (Custom) Fitted (MRI) – to an Insured named EM. Pursuant to Dr. Zakaria's prescription, Defendants submitted charges to GEICO through A&G Life Care totaling $2,258.80. The prescription originated from the Ocean Avenue Clinic and contained the following photocopied and/or stamped signature:



MUHAMMAD R. ZAKARIA, MD          LIC # 197646          NPI# 1447269824

2748 OCEAN AVE 5TH FLOOR BROOKLYN, NY 11229    TEL 718-673-8875    FAX 718-673-8878

(xvii)  On September 17, 2024, Dr. Sayeed purportedly prescribed Fraudulent Equipment – including a CCTU – to an Insured named AG. Pursuant to Dr. Sayeed's prescription, Defendants submitted charges to GEICO through Rosa Lynn Supply totaling $2,215.00. The prescription originated from the Ocean Avenue Clinic and contained the following photocopied and/or stamped signature:



(xviii)  On September 18, 2024, Dr. Zakaria purportedly prescribed Fraudulent Equipment – including a "Cervical Traction w/ Pump (MRI)" and "LSO APL (Custom Fitted) (MRI)" – to an Insured named AA. Pursuant to Dr. Zakaria's prescription, Defendants submitted charges to GEICO through Rosa Lynn Supply totaling $1722.72. The prescription originated from the Ocean Avenue Clinic and contained the following photocopied and/or stamped signature:



X _____

MUHAMMAD R ZAKARIA MD          LIC # 197646          NPI# 1447269824

2748 OCEAN AVE 5TH FLOOR BROOKLYN, NY 11229    TEL 718-673-8875    FAX 718-673-8878

153.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" through "6", Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME, and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to Defendants pursuant agreements with others who are not presently identifiable.

**(i)  The Billing for Medically Unnecessary CCTUs**

154.    As part of their fraudulent scheme, the Referring Providers purportedly prescribed, and Defendants purportedly provided and billed for CCTUs and, at times, attendant accessories resulting in charges of, typically, between $1,500.00 and $2,300.00 per insured who purportedly received the device.

155.    Virtually all of the charges for CCTUs that Defendants submitted, or caused to be submitted, were pursuant to fraudulent prescription forms. The fraudulent prescription forms were distributed to the Referring Providers by Defendants and/or and John Doe Defendants to solicit and steer prescriptions for CCTUs back to Defendants.

156.    The CCTUs purportedly dispensed by Defendants essentially provide cold therapy to a part of the patient's body, which is not more effective than using a standard ice pack and bandage.

157.    Where a patient is in a position to be able to place an ice-pack, there is no medically

necessary reason to use a CCTUs. This is especially true considering that medical studies have shown no difference in recovery or functionality of patients using a CCTUs compared to an ice pack.

158.    Moreover, the use of cold-therapy – either in the form of an ice pack or a CCTUs– subsequent to trauma to decrease swelling, is generally most effective during the first few days after acute injury.

159.    After the first few days, cold-therapy is only helpful to patients immediately after range of motion exercises performed during physical therapy. In that limited scenario, cold-therapy is typically provided by the physical therapist in the form of ice packs.

160.    It is improbable that a legitimate physician would issue a prescription for a CCTUs to a patient greater than one week post-motor vehicle accident.

161.    It is also improbable that a legitimate physician would issue a prescription for a CCTUs to a patient post-motor vehicle accident when that patient is able to use ice-packs.

162.    In keeping with the fact that the Fraudulent Equipment prescribed at various Clinics to the Insureds identified in Exhibits "1" through "6" were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, in the significant majority of instances the Insureds identified in Exhibits "1" through "6" were prescribed the CCTUs more than a week after the accident, and long after the period when cold therapy and compression – or even an ice pack and ACE bandage – would decrease swelling after the trauma from an automobile accident.

### ii. The Billing for Medically Unnecessary Triad Devices

163.    As part of the fraudulent scheme, the Referring Providers also prescribed and the DME Providers purportedly dispensed the "Triad Device 3LT Infrared Heat Pad with Low Level Light Therapy" resulting in charges of $1,800.00 to $2,800.00 per bill to GEICO.

164.    Virtually all of the charges for Triad Devices that Defendants submitted, or caused to be submitted, were pursuant to fraudulent prescription forms. As with the CCTUs, the fraudulent prescription forms were distributed to the Referring Providers by Defendants and/or and John Doe Defendants to solicit and steer prescriptions for Triad Devices back to Defendants.

165.    To create the false impression that the devices dispensed by the DME Providers were medically necessary, many prescriptions for the Triad Devices contained the following language:

> PRODUCT: Triad 3LTTm Infrared Heat Pad with Low Level Light Therapy (LLLT) - E0221
> I am prescribing the Triad 3LTTM Infrared Heat Pad with Low Level Light Therapy (LLLT) which is an FDA Cleared device to treat and reduce musculoskeletal pain and inflammation. The Triad 3LTTM LLLT combines three wavelengths Infrared Heat (830nm and 950nm) and Red Light Laser (630nm) for deep soft tissue penetration; supported by multiple Published Level I Double-blind studies showing the clinical benefits of LLLT Photobiomodulation Therapy. The patient can treat their acute or chronic pain and inflammation at home. I certify that the Triad 3LTTM device is medically indicated and in my opinion is reasonable and necessary to treat this patient's condition.

166.    Defendants provided the Triad Devices to Insureds who were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

167.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

168.    If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication. These clinical approaches are well-established.

169.    By contrast, the Triad Devices are FDA cleared for "light based over the counter wrinkle reduction", not for the treatment or reduction of musculoskeletal pain and inflammation.

170.    Furthermore, policy bulletins by commercial insurers make clear that low level

52

light therapy of the type purportedly provided by the Triad Devices is experimental and investigational and there is no legitimate body of evidence that establishes the effectiveness of low-level light therapy devices for the treatment of back, neck, or shoulder pain.

171.    Notwithstanding the experimental and investigational nature of low-level light therapy, Defendants repeatedly purported to dispense the expensive Triad Devices to numerous Insureds solely to maximize profits without regard to genuine patient care.

**E.  Defendants' Manipulation of the Prescriptions**

172.    The Defendants intentionally utilized the vague and generic prescriptions issued, or purportedly issued, by the Referring Providers to misrepresent the nature of the items actually prescribed and furthermore to misrepresent the items that the Defendants purportedly dispensed so as to claim entitlement to a higher fee payable when submitting bills under the name of The DME Providers.

173.    The Defendants unlawfully decided what DME and OD to provide Insureds without a proper prescription from a licensed healthcare provider.

174.    Upon obtaining the vague and generic prescriptions from John Doe Defendants pursuant to the predetermined protocols described above and collusive arrangements between the Defendants, the John Doe Defendants, and the Referring Providers, the Defendants were provided with the opportunity to choose one of several different pieces of Fraudulent Equipment, with varying reimbursement rates in the applicable fee schedule, that relate to the vague and generic terms indicated in the prescriptions.

175.    The ability to choose which specific type of DME and/or OD to provide an individual is specifically reserved for healthcare providers authorized by law to prescribe DME and/or OD.

176.     As unlicensed healthcare professionals, the Paper Owner Defendants were not legally authorized to prescribe or direct that an Insured receive any specific type of DME and/or OD.  Similarly, the DME Providers are not licensed professional corporations and do not employ any healthcare professionals who can legally prescribe or direct that an Insured receive any specific type of DME and/or OD.

177.     However, when the Defendants received vague and generic prescriptions for Fraudulent Equipment to purportedly provide Insureds, many of the items in the prescriptions were not specific enough to identify a specific item of DME and/or OD that could be provided to the Insureds.

178.     As a result, whenever the vague and generic prescriptions identified a type of Fraudulent Equipment that had multiple different HCPCS Codes, which are based on the specific and unique features associated with the item, the Defendants chose to bill GEICO using specific HCPCS Codes thereby asserting that they purportedly provided those unique pieces of Fraudulent Equipment to the Insureds.

179.     In a legitimate setting, upon receiving a vague and generic prescription for a type of DME and/or OD, the provider of DME and/or OD would contact the referring healthcare provider to request clarification on the specific items and features necessary to dispense to each patient.

180.     However, in all of the claims identified in Exhibits "1" – "6", whenever there was a vague and generic prescription for a type of DME and/or OD, the Defendants never contacted the Referring Provider to request clarification. Instead, the Defendants made their own determination as to which unique item of Fraudulent Equipment to provide each Insured.

181.     Furthermore, in each and every circumstance where the vague and generic

prescriptions allowed the Defendants to choose a unique piece of Fraudulent Equipment, the Defendants billed GEICO for, and thereby chose to purportedly provide the Insured with, the type of Fraudulent Equipment that resulted in one of the higher maximum reimbursable amounts under the applicable fee schedule.

182.    For example, in many of the prescriptions issued to the Defendants that are part of the claims identified in Exhibit "1", the prescriptions requested that the Defendants provide such generic items as a "Lumbar Orthosis Brace (with MRI)", "Lumbar Sacral Support", "Lumbar Orthosis", or "Lumbar Support 10" Back Panel" without any further specification.

183.    This vague and generic language in the prescriptions from the Referring Providers for lumbar supports directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds, including:

   (i)     HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

   (ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

   (iii)   HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

   (i)     HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

   (ii)    HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

   (iii)   HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(iv)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(v)     HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(vi)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(vii)   HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(viii)  HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(ix)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(x)     HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xi)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xii)   HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiii)  HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xiv)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xv)    HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a

maximum reimbursement rate of $283.76.

(xvi)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xvii)   HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xviii) HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xix)   HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xx)   HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

184.   As unlicensed healthcare providers, the DME Providers were not legally permitted to determine which of the above-available options were best suited for each Insured that had generic prescriptions for a "Lumbar Orthosis Brace (with MRI)", "Lumbar Sacral Support", "Lumbar Orthosis", or "Lumbar Support 10" Back Panel".

185.   Here, the Defendants never contacted any of the Referring Providers whose names appeared on the vague and generic prescriptions for lumbar related Fraudulent Equipment and instead took it upon themselves to decide which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds.

186.   The Defendants often submitted charges of either $1,150.00 or $741.59 using HCPCS codes L0632 or L0650 pursuant to generic prescriptions, which have two of the higher maximum reimbursable amounts out of the lumbar support items in the Fee Schedule.

187.    As an additional example, and as identified in "Exhibits "1" through "6" the Defendants submitted charges for $110.00 and $536.08 under HCPCS Code L1820 and/or L1833 respectively for purportedly supplying Insureds with a "Knee Support." Similar to the charges for LSOs and shoulder orthoses, the phrase "Knee Support" applies to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds.

188.    As an additional example, and as identified in "Exhibits "1" through "6" the Defendants submitted charges for $111.07 and $690.23 under HCPCS Code L3670 and L3671 respectively for purportedly supplying Insureds with a "Shoulder Support." Similar to the charges for LSOs, the phrase "Shoulder Support" applies to 8 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds.

189.    As an additional example, and as identified in Exhibits "1" through "6" the Defendants regularly submitted charges for $233.00 under HCPCS Code L0180 for purportedly supplying Insureds with a "cervical collar." However, the phrase "cervical collar" applies to over 10 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds.

190.    In virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" that are based upon vague and generic language in prescriptions provided by the Referring Providers, the Defendants decided the unique type of Fraudulent Equipment to purportedly provide Insureds without any legal authority to do so or any clarification from the prescribing healthcare provider.

**F.    Defendants' Manipulation of the Prescriptions**

191.    As part of Defendants' common scheme and controlled by the Secret Owner, the

bills submitted to GEICO and other New York automobile insurers by Defendants were also fraudulent in that they each made virtually identical misrepresentations in the DME and OD purportedly provided to the Insureds.

192.    In the bills and other documents submitted to GEICO, Defendants knowingly misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between Defendants and others who are not presently identifiable.

193.    In the bills and other documents submitted to GEICO, Defendants also misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between Defendants and others who are presently unidentifiable.

194.    Further, Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

195.    Moreover, and as explained below, the bills submitted to GEICO by Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

196.    Thereafter, Defendants would submit multiple bills to GEICO for Fraudulent

Equipment that was provided to Insureds on the same date in an attempt to conceal their scheme to fraudulently bill GEICO for Fraudulent Equipment purportedly provided to GEICO's Insureds by artificially lowering the amount of any one bill submitted to GEICO.

### i.    The Defendants Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided

197.    As explained below, the bills submitted to GEICO by Defendants each misrepresented that the type of Fraudulent Equipment provided, to the extent any Fraudulent Equipment was provided, matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

198.    When Defendants submitted bills to GEICO they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS codes used on the bills properly described the type of Fraudulent Equipment that was provided to the Insureds.

199.    As indicated above, the Fee Schedule specifically defines the requirements for each HCPCS Code to bill for DME and/or OD.

200.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

201.    By submitting bills to GEICO containing specific HCPCS Codes, Defendants represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

202.    However, in many of the claims for Fraudulent Equipment identified in Exhibits "1" – "6", when Defendants submitted bills to GEICO, they fraudulently represented to GEICO that the HCPCS codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment

was actually provided.

203.    For example, the Defendants submitted bills to GEICO that fraudulently misrepresented the type of Fraudulent Equipment that they purportedly provided by billing GEICO for "custom fitted" pieces when the Fraudulent Equipment was not customized at all – to the extent that Fraudulent Equipment was actually provided.

204.    As identified in the claims contained within Exhibits "1" – "6", Defendants often billed GEICO for Fraudulent Equipment that was purportedly customized for each Insured.  Each HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will specify whether the specific item provided to a patient is either "off-the-shelf" or specifically "custom-fabricated" or "custom-fitted" for that individual patient.

205.    In order to help clarify the term "custom-fabricated", Palmetto defined a custom-fabricated orthotic as something that "is individually made for a specific patient. No other patient would be able to use this item. A custom fabricated item is a device which is fabricated based on clinically derived and rectified castings, tracings, measurements, and/or other images (such as x-rays) of the body part. The fabrication may involve using calculations, templates and components. This process requires the use of basic materials including, but not limited to plastic, metal, leather or cloth in the form of uncut or unshaped sheets, bars, or other basic forms and involves substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling and finishing prior to fitting on the patient".  See Palmetto, Correct Coding –3-D Printed Orthotic Devices.

206.    In essence, a custom-fabricated orthotic is created and manufactured from scratch for use by a specific patient.

207.    To help clarify the term "custom-fitted", Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to

provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

208.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) falls into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

209.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

210.    As shown in the claims identified within Exhibits "1" – "6", Defendants often billed for Fraudulent Equipment that was purportedly "custom-fabricated" or "custom-fitted" for each Insured when – and to the extent that Fraudulent Equipment was actually provided – the items were never custom fabricated or fitted, as that term is defined by Palmetto.

211.    Based upon the prescriptions allegedly issued by the Referring Providers, the Defendants submitted bills to GEICO for custom fit orthotics under HCPCS Codes L0632, L0650, L1820, L1833, L3670, and L3671.

212.    The products assigned to HCPCS Codes L0632, L0650, L1820, L1833, L3670, and L3671 are types of orthoses that are customized to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by Defendants.

213.    Instead, to the extent that Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for HCPCS Codes L0632, L0650, L1820, L1833, L3670, and L3671, the Fraudulent Equipment was provided without taking any action to custom-fabricate or fit the OD to the Insureds. To the extent that Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibits "1" – "6", Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

214.    In keeping with the fact that Defendants misrepresented that they custom-fabricated or fit OD purportedly provided to Insureds and billed to GEICO, the Paper Owner Defendants are not certified orthotists and did not complete sufficient training to become certified orthotists.

215.    In addition to Defendants collectively submitting hundreds of charges for custom fabricated or custom fit OD, and as part of their common fraudulent scheme, each of Defendants

in a virtually identical manner fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits

216. The claims identified in Exhibits "1" – "6" for HCPCS Code E2611 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

217. Each of the claims identified within Exhibits "1" – "6" for HCPCS Code E2611 contained a charge for $282.40 typically based upon prescriptions for a "Lumbar Cushion".

218. However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

219. Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2611, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not cushions for use with a wheelchair.

220. In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" – "6" who were provided with a cushion by Defendants that was billed to GEICO under HCPCS Code E2611, were in a wheelchair

221. The claims identified in Exhibits "1" – "6" for HCPCS Code T5001 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

222.    Each of the claims identified within Exhibits "1" – "6" for HCPCS Code T5001 contained a charge of $405.00 based upon prescriptions for a "Car Seat".

223.    However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons (primarily children) with special orthopedic needs such as cerebral palsy, whose postural needs cannot be safely met by less costly alternatives such as the vehicle's restraint system or other restraint systems, and the person cannot use a standard/commercially available car seat.

224.    The following picture represents the type of car seat contemplated by HCPCS Code T5001:



225.    However, the orthopedic car seats purportedly provided by Defendants – to the extent that any items were provided – qualified as positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190, defined as a "positioning cushion/pillow/wedge, any shape or size, includes all components and accessories", and having a maximum reimbursement rate of $22.04 per unit.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

226.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the names of the DME Providers, seeking payment for Fraudulent Equipment.

227.    The NF-3 forms or HCFA-1500 forms that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and therefore, were entitled to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(ii)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, delivery receipts, and attached documents uniformly misrepresented to GEICO the reimbursement amount for the Fee Schedule items provided to the Insureds, to the extent that Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

228.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

229.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

230. Specifically, the Defendants knowingly misrepresented and concealed facts related to the unlawful financial arrangements with the John Doe Defendants and others that formed the basis for the prescriptions for Fraudulent Equipment that were provided to the Defendants and ultimately used as the basis to submit bills to GEICO, in order to prevent GEICO from discovering that the Defendants unlawfully exchanged kickbacks for patient referrals and that the Fraudulent Equipment was billed to GEICO to maximize financial gain without regard to genuine patient care.

231. Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the prescriptions for Fraudulent Equipment were medically unnecessary and were issued pursuant to predetermined protocols, rather than to treat the Insureds who supposedly received the Fraudulent Equipment.

232. Furthermore, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

233. In addition, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the insureds.

234. The billing and supporting documentation submitted by the DME Providers, when viewed in isolation, did not reveal its fraudulent nature.

235. GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

236.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Defendants; or (ii) timely issued requests for verification with respect to all of the pending claims for No-Fault Benefits submitted through Defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

237.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against GEICO and other insurers. The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of no-fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises.

238.    In fact, Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that DME Defendants have been engaged in widespread fraud.

239.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation

activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $2,000,000.00 based upon the fraudulent charges representing payments made by GEICO to Defendants.

240.    Based upon Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the DME Providers**
**(Carepoint Med Supply, A & G Life Care, Health and Safety, Medcomfort Supply, Rosa Lynn Supply, and Vitallink Med Supply)**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

241.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

242.    There is an actual case in controversy between GEICO and each of the DME Providers regarding more than $1,359,000.00 in fraudulent billing that has been submitted to GEICO in the names of the DME Providers.

243.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted, pursuant to predetermined protocols designed solely to financially enrich the Defendants and the John Doe Defendants, rather than to treat the Insureds.

244.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the DME Providers provided Fraudulent Equipment as a result of its participation in unlawful financial arrangements.

245.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the DME Providers purportedly provided Fraudulent Equipment as a result of

decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

246.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers actually provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

247.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Carepoint Med Supply, A & G Life Care, Health and Safety, Medcomfort Supply, Rosa Lynn Supply, and Vitallink Med Supply.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

248.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

249.    Carepoint Med Supply, A & G Life Care, Health and Safety, Medcomfort Supply, Rosa Lynn Supply, and Vitallink Med Supply together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

250.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Carepoint Med Supply, A & G Life Care, Health and Safety,

Medcomfort Supply, Rosa Lynn Supply, and Vitallink Med Supply are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other New York automobile insurers.

251.    The DME Provider Enterprise operated under multiple separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

252.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

253.    The Paper Owner Defendants and John Doe Defendant "1" have each been employed by and/or associated with the DME Provider Enterprise.

254.    Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to predetermined protocols designed solely to financially enrich the Defendants and the John Doe Defendants, including the John Doe Defendants, rather than to treat the Insureds; (ii) the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to unlawful financial arrangements between the Defendants and the John Doe Defendants; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legal authorized to prescribe DME and/or OD; and (iv) to the extent the DME Provider Enterprise actually provided any Fraudulent Equipment, the DME Provider Enterprise fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "6".

255.    The DME Providers Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Providers, inasmuch as the DME Providers never operated as a legitimate DME

provider, never was entitled to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to bill GEICO and other New York automobile insurers and attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

256.    The DME Providers Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Providers Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing.

257.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

258.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

259.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

260.    The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

261.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Providers Enterprise.

262.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Providers Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to predetermined protocols designed solely to financially enrich the Defendants and the John Doe Defendants, including the John Doe Defendants, rather than to treat the Insureds; (ii) the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to unlawful financial arrangements between the Defendants and the John Doe Defendants; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legal authorized to prescribe DME and/or OD; and (iv) to the extent the DME Provider Enterprise actually provided any Fraudulent Equipment, the DME Provider Enterprise fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "6".

263. The Paper Owner Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

264. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,000,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

265. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Carepoint Med Supply, Fleyshman, and John Doe Defendant "1"**
**(Common Law Fraud)**

266. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

267. Carepoint Med Supply, Fleyshman, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

268. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to unlawful financial arrangements; and (iii) to the

extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD.

269.    Carepoint Med Supply, Fleyshman, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Carepoint Med Supply that were not compensable under New York no-fault insurance laws.

270.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $358,000.00 pursuant to the fraudulent bills submitted by Carepoint Med Supply, Fleyshman, and John Doe Defendant "1".

271.    Carepoint Med Supply, Fleyshman, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

272.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Carepoint Med Supply, Fleyshman, and John Doe Defendant "1"**
**(Unjust Enrichment)**

273.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

274.    As set forth above, Carepoint Med Supply, Fleyshman, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

275.    When GEICO paid the bills and charges submitted by or on behalf of Carepoint Med Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

276.    Carepoint Med Supply, Fleyshman, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Carepoint Med Supply, Fleyshman, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

277.    The retention of GEICO's payments by Carepoint Med Supply, Fleyshman, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

278.    By reason of the above, Carepoint Med Supply, Fleyshman, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $358,000.00.

## SIXTH CAUSE OF ACTION
### Against A & G Life Care, Berkman, and John Doe Defendant "1"
### (Common Law Fraud)

279.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

280.    A & G Life Care, Berkman, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

281.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to unlawful financial arrangements; (iii) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; and (iv) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

282.    A & G Life Care, Berkman, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through A & G Life Care that were not compensable under New York no-fault insurance laws.

283.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $400,000.00 pursuant to the fraudulent bills submitted by A & G Life Care, Berkman, and John Doe Defendant "1".

284.    A & G Life Care, Berkman, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

285.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against A & G Life Care, Berkman, and John Doe Defendant "1"**
**(Unjust Enrichment)**

286.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

287.    As set forth above, A & G Life Care, Berkman, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

288.    When GEICO paid the bills and charges submitted by or on behalf of A & G Life Care for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

289.    A & G Life Care, Berkman, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that A & G Life Care, Berkman, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

290.    The retention of GEICO's payments by A & G Life Care, Berkman, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

291.    By reason of the above, A & G Life Care, Berkman, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $400,000.00.

### EIGHTH CAUSE OF ACTION
**Against Health and Safety, Firayner, and John Doe Defendant "1"**
**(Common Law Fraud)**

292.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

293.    Health and Safety, Firayner, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

294.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to unlawful financial arrangements;  (iii) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; and (iv) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained

in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

295.    Health and Safety, Firayner, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Health and Safety that were not compensable under New York no-fault insurance laws.

296.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $470,000.00 pursuant to the fraudulent bills submitted by Health and Safety, Firayner, and John Doe Defendant "1".

297.    Health and Safety, Firayner, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

298.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Health and Safety, Firayner, and John Doe Defendant "1"
### (Unjust Enrichment)

299.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

300.    As set forth above, Health and Safety, Firayner, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

301.    When GEICO paid the bills and charges submitted by or on behalf of Health and Safety for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

302.    Health and Safety, Firayner, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Health and Safety, Firayner, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

303.    The retention of GEICO's payments by Health and Safety, Firayner, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

304.    By reason of the above, Health and Safety, Firayner, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $470,000.00.

## TENTH CAUSE OF ACTION
**Against Medcomfort Supply, Shanditseva, and John Doe Defendant "1"**
**(Common Law Fraud)**

305.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

306.    Medcomfort Supply, Shanditseva, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

307.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided

pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to unlawful financial arrangements; and (iii) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD .

308.    Medcomfort Supply, Shanditseva, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Medcomfort Supply that were not compensable under New York no-fault insurance laws.

309.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $250,000.00 pursuant to the fraudulent bills submitted by Medcomfort Supply, Shanditseva, and John Doe Defendant "1".

310.    Medcomfort Supply, Shanditseva, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

311.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Medcomfort Supply, Shanditseva, and John Doe Defendant "1"**

**(Unjust Enrichment)**

312.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

313.    As set forth above, Medcomfort Supply, Shanditseva, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

314.    When GEICO paid the bills and charges submitted by or on behalf of Medcomfort Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

315.    Medcomfort Supply, Shanditseva, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Medcomfort Supply, Shanditseva, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

316.    The retention of GEICO's payments by Medcomfort Supply, Shanditseva, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

317.    By reason of the above, Medcomfort Supply, Shanditseva, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $250,000.00.

**TWELFTH CAUSE OF ACTION**
**Against Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1"**
**(Common Law Fraud)**

318.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

319.    Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material

facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

320.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to unlawful financial arrangements;  and (iii) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD .

321.    Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Rosa Lynn Supply that were not compensable under New York no-fault insurance laws.

322.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $408,000.00 pursuant to the fraudulent bills submitted by Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1".

323.    Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

324.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1"**
**(Unjust Enrichment)**

325.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

326.    As set forth above, Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

327.    When GEICO paid the bills and charges submitted by or on behalf of Rosa Lynn Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

328.    Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

329.    The retention of GEICO's payments by Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

330.    By reason of the above, Rosa Lynn Supply, Cruz de Robles, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $408,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against Vitallink, Kruzhkova, and John Doe Defendant "1"
### (Common Law Fraud)

331.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

332.    Vitallink, Kruzhkova, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

333.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined protocols, and not based upon medical necessity, that were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to unlawful financial arrangements; (iii) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD and (iv) to the extent that any Fraudulent Equipment was actually provided, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained

87

in the bills submitted to GEICO when in fact the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

334.    Vitallink, Kruzhkova, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Vitallink that were not compensable under New York no-fault insurance laws.

335.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $294,000.00 pursuant to the fraudulent bills submitted by Vitallink, Kruzhkova, and John Doe Defendant "1".

336.    Vitallink, Kruzhkova, and John Doe Defendant "1" extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

337.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Vitallink, Kruzhkova, and John Doe Defendant "1"**
**(Unjust Enrichment)**

338.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

339.    As set forth above, Vitallink, Kruzhkova, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

340.    When GEICO paid the bills and charges submitted by or on behalf of Vitallink for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

341.    Vitallink, Kruzhkova, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Vitallink, Kruzhkova, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

342.    The retention of GEICO's payments by Vitallink, Kruzhkova, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

343.    By reason of the above, Vitallink, Kruzhkova, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $294,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Carepoint Med Supply, A & G Life Care, Health and Safety, Medcomfort Supply, Rosa Lynn Supply, and Vitallink Med Supply for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Carepoint Med Supply, A & G Life Care, Health and Safety, Medcomfort Supply, Rosa Lynn Supply, and Vitallink Med Supply have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at

trial but more than $2,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  C.  On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $2,000,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  D.  On the Fourth Cause of Action against Fleyshman, Carepoint Med Supply and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $358,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  E.  On the Fifth Cause of Action against Fleyshman, Carepoint Med Supply and John Doe Defendant "1" for more than $358,000.00  in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

  F.  On the Sixth Cause of Action against Berkman, A & G Life Care, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  G.  On the Seventh Cause of Action against Berkman, A & G Life Care and John Doe Defendant "1" for more than $400,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

  H.  On the Eighth Cause of Action against Firayner, Health and Safety, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial

but in excess of $470,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Firayner, Health and Safety, and John Doe Defendant "1" for more than $470,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Shanditseva, Medcomfort Supply, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $250,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Shanditseva, Medcomfort Supply, and John Doe Defendant "1" for more than $250,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L.       On the Twelfth Cause of Action against Cruz de Robles, Rosa Lynn Supply, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $408,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Cruz de Robles, Rosa Lynn Supply, and John Doe Defendant "1" for more than $408,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Thirteenth Cause of Action against Vitallink, Kruzhkova, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $294,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.    On the Fourteenth Cause of Action against Vitallink, Kruzhkova, and John Doe

Defendant "1" for more than $294,000.00 in compensatory damages, plus costs and interest and

such other and further relief as this Court deems just and proper;


Dated: August 7, 2025
        Uniondale, New York

                                        RIVKIN RADLER LLP


                                        By:    /s/ Barry I. Levy
                                                Barry I. Levy, Esq.
                                                Michael Vanunu, Esq.
                                                Joanna Rosenblatt, Esq.
                                        926 RXR Plaza
                                        Uniondale, New York 11556
                                        (516) 357-3000

                                        *Counsel for Plaintiffs Government Employees
                                        Insurance Company, GEICO Indemnity Company,
                                        GEICO General Insurance Company and GEICO
                                        Casualty Company*